AARON D. FORD
  Attorney General
LOUIS V. CSOKA (Bar No. 7667)
  Senior Deputy Attorney General
MATTHEW FEELEY (Bar No. 13336)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
555 East Washington Ave., #3900
Las Vegas, Nevada  89101
(702) 486-3120 (phone)
(702) 486-3416 (fax)
E-mail:  mfeeley@ag.nv.gov

*Attorneys for Defendants
Nevada Transportation Authority
and Vaughn Hartung*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WESTERN TRAILS CHARTERS & TOURS LLC, dba SALT LAKE EXPRESS, an Idaho Limited Liability Company,<br><br>                    Plaintiff,<br><br>v.<br><br>NEVADA TRANSPORTATION AUTHORITY, a Division of the Nevada Department of Business and Industry, VAUGHN HARTUNG in his official capacity as Chair of the Commissioners of the Nevada Transportation Authority, JOHN DOES 1-X,<br><br>                    Defendants. | Case No.  3:23-cv-00219-RCJ-CLB<br><br>**OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION (ECF No. 6)** |

Defendants Nevada Transportation Authority ("NTA"), a State Agency, and Vaughn Hartung, in his official capacity as Chair of the NTA, by and through counsel, Aaron D. Ford, Attorney General of the State of Nevada, and Matthew Feeley, Deputy Attorney General, hereby oppose Plaintiff's Emergency Motion for Temporary Restraining Order / Preliminary Injunction (ECF No. 6).

This opposition is based on the following Memorandum of Points and Authorities and the papers and pleadings on file herein.

MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs begins its description of the Nature of this Action by stating that the NTA has declared war on Salt Lake Express. ECF No. 6 at 2. That is the perfect opening line for the rest of their motion; full of hyperbole and flash, but short of any legal or factual basis.

Plaintiff, for years, has provided transportation for passengers between Reno and Las Vegas. Although they run other routes among and between neighboring states, this particular route was all within Nevada. As such, it is intrastate transportation, and subject to regulation by the NTA. Plaintiff initially applied for and received the proper license, a Certificate of Public Convenience and Necessity ("CPCN"). Plaintiffs were ultimately issued citations for alleged safety violations. Though properly noticed, they failed to appear for the hearings on those citations. Subsequently, their license was suspended, pending a hearing on the matter. While suspended, they continued to operate that same route, and as such, one of their vehicles was impounded. Instead of trying to clear this up through the appropriate administrative process, they ran here to Federal Court. They claim that by adding two stops to their route, both in California, that they are no longer subject to NTA regulation. However, like their allegation of a declaration of war, this claim is neither legally or even factually accurate. This motion for a TRO/PI should be denied. The NTA has acted appropriately throughout this matter, and has not treated Salt Lake Express unfairly in any way.

## II.   STATEMENT OF FACTS

### A.   Relevant NTA Roles and Responsibilities

NTA administers and enforces state laws *inter alia* pertaining to *intrastate* transportation providers and derives its regulatory authority under Nevada Revised Statutes ("NRS") Chapters 706, 706A, and 706B. In this regard, the NTA has been charged with the responsibility of providing fair and impartial regulation, to promote

safe, adequate, economical, and efficient service, and to foster sound economic conditions in motor transportation.  *See* NRS 706.151.

In particular, Nevada Senate Bill 266 established the modern form of state transportation regulations in NRS Chapter 706 (some of which predate that adoption) and set forth the legislative intent behind enacting it.  *See* 1971 Statutes of Nevada, Page 690 (Chapter 383, SB 266, Sec. 30).  It states that the Nevada Legislature's purpose and policy behind enacting NRS Chapter 706 was to give the NTA the authority to regulate *intrastate* transportation vehicles and to establish reasonable rates.  *Id*.

Specifically, SB 266 states the legislative intent behind the enactment of NRS Chapter 706 was to:

> "***confer upon the . . . [NTA] the power and authority and to make it the duty of the . . . [NTA]  to supervise and regulate common and contract motor carriers and brokers***, and to regulate for licensing purposes private motor carriers of property when used for private commercial enterprises on the highways of this state,
>
> "***To provide for fair and impartial regulation, to promote safe, adequate, economical conditions in motor transportation, and to encourage the establishment and maintenance of reasonable charges for such transportation services***, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices."

1971 Statutes of Nevada, Page 690 (Chapter 383, SB 266, Sec. 30(1)(a),(c)) (emphasis added).

**One of the many relevant responsibilities that the Nevada Legislature has also specifically entrusted to the NTA is to ensure that *intrastate* transportation of passengers is not performed by <u>unlicensed, unregulated, uninspected, and uninsured motor carriers.</u>** *See* NRS 706.386 (prohibiting unlicensed carriers from providing passenger transportation in the State of Nevada); NRS 706.758 (prohibiting such carriers from advertising such services in the State of Nevada); and NRS 706.476 (requiring  NTA  enforcement agents to undertake enforcement action . . .

against such carriers, when they fail to meet NTA's licensing, regulatory, and insurance requirements).[1]

The authority may pursue criminal charges for certain violations pursuant to NRS 706.756. Specifically, NRS 706.756(3) allows for a violation of NRS 706.386, under certain conditions, to be found as a gross misdemeanor. Additionally, the Authority may issue administrative fines of not more than $10,000 for any violation, pursuant to NRS 706.771.

These laws grant the NTA certain authority and responsibility.

In particular, NRS 706.476 provides that:

> A vehicle used as a taxicab, limousine or other passenger vehicle in passenger service or to provide towing services or the transportation of household goods **must be impounded by the Authority if a certificate of public convenience and necessity is required to be issued to authorize its operation but has not been issued to authorize its operation**.

*Id.* (emphasis added).

Thereafter, NRS 706.476 further affords due process to the owner of the vehicle whose vehicle was impounded, by requiring the NTA to hold a hearing on the release of the subject vehicle within forty-eight (48) hours of that impoundment. *See id.*[2] Additionally, the statute sets out a maximum fine amount of $10,000 which may be assessed against a registered owner, and holds that "the Authority shall return the

---

[1] One of the purposes of these laws is to prevent passenger transportation, where, in cases of an accident, insurance coverage would be denied because of the unlicensed nature of the transportation. *See* Emerson, Elaine, *Nevada transportation officials bust 40 fake rideshare drivers* (Fox5 News Report, Apr. 28, 2021) available at www.youtube.com (last visited May 28, 2023) (comments of former NTA Commissioner David Newton).

[2] This statute was first promulgated in 1997, first amended in 1999, with the most recent amendment to the statute being in 2009. *See id.* This shows that this statute has been vetted on multiple occasions by the Nevada Legislative Council Bureau, the Nevada Legislature, and several prior Nevada Governors. To date, there has been no Nevada reported cases where this statute has been in any way limited.

vehicle after any administrative fine imposed pursuant to this subsection and all costs of impoundment have been paid." *See id.*

Both the United States Supreme Court and the Ninth Circuit Court of Appeals have rendered opinions, which speak directly to the issue of whether an administrative officer may lawfully impound a vehicle, even when the officer's function is totally separate from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute. *See infra.*

In *Opperman,* the Supreme Court held that "[t]he authority of the police to seize and remove from the street vehicles impeding traffic or threatening public safety and convenience *is beyond challenge.*" *South Dakota v. Opperman,* 428 U.S. 364, 369 (1976) (emphasis added). In explaining the "community caretaking function," enforcement agents may impound a vehicle, if it is in the "interest of public safety." *See id.* at 367-372; *see also Cady v. Dombrowski,* 413 U.S. 433, 441 (1973); *Miranda v. City of Cornelius,* 429 F.3d 858 (9th Cir. 2005) (holding that vehicles which jeopardize public safety may be impounded); *Kee v. Mersch,* 297 Fed. Appx. 615 (9th Cir. 2008) (holding that plaintiff failed to state a claim within 42 U.S.C. §1983, relative to NTA enforcement agents' impoundment of his vehicle, pursuant to NRS Chapter 706); *Levin v. NV Transportation Authority,* 3:15-cv-00618 (D. Nev. 2016) (unpublished decision) (holding similarly); *see generally PSV of Nevada v. Smith,* 61 Nev. 245, 249; 123 P.2d 237, 239 (1942) (holding that the state prohibition of *intrastate transportation without a license* is entirely valid) (citing *Eichholz v. Public Service Commission*, 306 U.S. 268, 59 S. Ct. 532 (1939)).

**B. <u>NTA Procedure for Carrier Violations</u>**

As stated above, NRS 706.771 allows the Authority to seek an administrative fine for violations of its rules. Pursuant to NRS 706.771(2), a fine imposed by the Authority may be recovered by the Authority only after notice is given and a hearing is held pursuant to the provisions of chapter 233B of NRS. Pursuant to NRS 706.1514, an administrative proceeding conducted pursuant to subsection 2 of NRS 706.771 may be conducted by a hearing officer designated by the Chair of the Authority. In doing so, the

duties of the hearing officer are laid out in Nevada Administrative Code ("NAC") 706.4015, which include conducting a fair and impartial hearing (NAC 706.4015(1)(b)) and preparing a proposed decision for review by the Authority (NAC 706.4015(1)(f)). Any party to an administrative proceeding conducted by a hearing officer may appeal a ruling of the hearing officer on any procedural matter to the Authority by filing a request for further consideration with the hearing officer within 15 days after the ruling is made. NAC 706.4016(1). Pursuant to NAC 706.4017, the Authority will review the decision of a hearing officer and enter a final order affirming, modifying or setting aside the decision.

Once the Authority issues their final order, an aggrieved party may still file a petition for rehearing pursuant to NRS 233B.130(4). Additionally, an aggrieved party is entitled to judicial review in district court, pursuant to NRS 233B.130(1). And further still, an aggrieved party may obtain a review of any final judgment of the district court by appeal to the appellate court, pursuant to NRS 233B.150.

As for a suspension or revocation of a license, that is governed by NRS 233B.127(3), which states:

> 3. No revocation, suspension, annulment or withdrawal of any license is lawful unless, before the institution of agency proceedings, the agency gave notice by certified mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. ***If the agency finds that public health, safety or welfare imperatively require emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action.*** An agency's order of summary suspension may be issued by the agency or by the Chair of the governing body of the agency. If the order of summary suspension is issued by the Chair of the governing body of the agency, the Chair shall not participate in any further proceedings of the agency relating to that order. ***Proceedings relating to the order of summary suspension must be instituted and determined within 45 days after the date of the order unless the agency and the licensee mutually agree in writing to a longer period.***

NRS 233B.127(3). (emphasis added)

**C. A State Agency's Interpretation of the Statutes it is Assigned to Administer**

An agency may exercise only those powers conferred upon them by implication to perform their duties. *See Clark County School Dist. v. Clark County Classroom Teachers Assoc.*, 115 Nev. 98, 977 P.2d 1008 (1999). In particular, such powers entitle an agency to interpret the statutes it is assigned to administer, apply them to the facts of the case, and make a decision. *See, e.g., K-Mart v. State Indust. Ins. System*, 693 P.2d 562 Nev. (1985). An agency may only carry into effect the intent of the Legislature as expressed by the enabling statute. **"An agency may not . . . amend or change enactments of the [L]egislature."** *Kitsap-Mason Dairyman's Assoc. v. Washington Tax. Comm.*, 467 P.2d 312, 315 (Wash. 1970) (internal citations omitted) (emphasis added).

So long as the language of the enabling acts are followed, the Nevada Supreme Court has said that the decision of an agency may only be set aside if the "decision is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record or is arbitrary, capricious or characterized by abuse of discretion." *Ranieri v. Catholic Community Services, et al.*, 111 Nev. 1057, 1061 (Nev. 1995); *see also Meridian Gold Co. v. State ex rel. Dep't. of Taxation*, 119 Nev. 630, 633 (Nev. 2003) (holding similarly).

**In that regard, great deference is given to an agency's interpretation, when it is within the language of the statute.** *See State v. State Engineer Morros*, 766 P.2d 263, 266 (Nev. 1988); *see also State Div. of Ins. v. State Farm Mut. Ins.*, 995 P.2d 482, 485 Nev. (2000) (stating that courts will defer "to an agency's interpretation of a statute that the agency is charged with enforcing"); *SIIS v. Snyder*, 865 P.2d 1168, 1171 (Nev. 1993) (holding that the construction placed upon a statute by the agency charged with administering is entitled to deference); *Westergard v. Barnes*, 784 P.2d 944, 947 (Nev. 1989) (holding similarly).

In short, the NTA is tasked with enforcing Nevada transportation statutory provisions as enacted by the Nevada Legislature, which includes its duty to ensure that no

unlicensed, unregulated, uninspected, and uninsured *intrastate* passenger ground transportation would occur.  In doing so, the NTA is afforded deference in its statutory interpretation, particularly where no contrary and binding legal authority exists.

### D. <u>Timeline of interaction between the NTA and Salt Lake Express</u>

On May 22, 2023, Plaintiff filed its Complaint. (ECF No. 1). On May 24, 2023, Plaintiff filed both a Motion for Temporary Restraining Order (TRO) (ECF No. 6) and a Motion for Preliminary Injunction (PI) (ECF No. 8). Both ECF No. 6 and No. 8 are titled the same and are virtually identical documents, save for the fact that ECF No. 8 has one additional exhibit. (*Compare* ECF No. 6 with ECF No. 8).

Naturally the Complaint requests additional relief beyond what is requested in the TRO/PI and includes additional legal theories. However, The *Nature of the Action* section of the TRO/PI is almost identical to the *Nature of the Action* section of the Complaint, notwithstanding a few minor differences. (Compare ECF No. 1 with ECF Nos 6 and 8). Plaintiff's *Nature of the Action* includes relevant dates, but also includes a series of events that is not altogether accurate.

A relevant timeline of the interaction between the NTA and Salt Lake Express is as follows:

January 22, 2018 – NTA issued License ("CPCN") 2238 to Salt Lake Express permitting intrastate charter bus service between points and places within the State of Nevada.

March 15, 2021 – Salt Lake Express received citation 23151 (Reno)

March 16, 2021 – Salt Lake Express received citation 22331 (Las Vegas)

March 17, 2021 – Salt Lake Express submitted an application for additional CPCN. This application was incomplete and/or inaccurate and wasn't completed and accepted by NTA until March 10, 2022, almost one year later.

March 18, 2021 - Salt Lake Express received Interim Temporary Authority through CPCN  1144 permitting special services and airport transfers within the State of Nevada.

. . .

With this CPCN, Salt Lake Express provided transportation between Reno and Las Vegas (and vice versa), stopping at other locations, all within Nevada.

May 5, 2022 – Salt Lake Express received citation 22939

June 10, 2022 – Salt Lake Express received citation 23857 and 23858

June 28, 2022 - Scheduled Hearing date for citations 23151, 22331, 23857, 23857 and 22939. On this date, Counsel for Salt Lake Express, Adam Ford ("Ford") emailed NTA Staff Attorney Patricia Erickson ("Erickson") requesting the WebEx information for the hearing. Erickson advised Ford that this was scheduled as an in-person hearing, so the hearing date was reset to July 26, 2022.

July 26, 2022 – Hearing on citations 23151, 22331, 23857, 23857 and 22939. (See Findings of Fact, Conclusions of Law, and Order from that hearing, submitted as Exhibit 1).

March 29, 2023 – citations 24760, 24765 and 24766 issued with hearing date set for April 26, 2023.  These citations were sent by certified mail, were received and signed for by Katrina Luthy on April 3, 2023, and the proof was received back by NTA on April 11, 2023 (*See* attached copy of Certified Mail Receipt, submitted as Exhibit 2).

April 26, 2023 – Salt Lake Express failed to appear for the scheduled hearing. A new hearing date was set for May 10, 2023, with notice being sent to Salt Lake Express' Rexburg Idaho address.

May 10, 2023 – Salt Lake Express again failed to appear for the Hearing regarding citations 24760, 24765 and 24766. A Failure to Appear ("FTA") hearing was conducted. An Emergency Summary Suspension Order was issued. (*See* Emergency Order of Suspension, submitted as Exhibit 3.) Pursuant to NRS 233B.127(3), a hearing on this suspension must be held within 45 days, unless a later date is agreed upon in writing by the parties. The Hearing was set for May 18, 2023, only eight days after its issuance.

May 15, 2023 – NTA Investigators witness a Salt Lake Express vehicle at the Reno Airport passenger pick-up area. Knowing that Salt Lake Express' did not have a license, as it was suspended on the 10th, the investigators spoke to the Driver of the vehicle,

Andrea Gray ("Grey"). Grey explained that as of May 11, 2023, she now drives over the state line into California where she turns around in a campground and heads back into Nevada to begin her pick up passengers in Reno. The investigators spoke to some of the passengers prior to them boarding the vehicle who explained that they were traveling to other locations in Nevada. The investigators did not cite nor impound a vehicle at this time. (See Investigative report for citation 24785 and Impound  4555, submitted as Exhibit 4)

May 17, 2023 – NTA investigators again find that Salt Lake Express is picking up passengers in both the Reno Airport, and The Reno Nugget Casino. Investigators again stopped the vehicle and spoke to the Driver, Grey. Grey explained that she would be running her normal route which would have her return to Reno after dropping her passengers in Tonopah, Nevada. At this time the investigators issued citation number 24785 and impounded the Salt Lake Express vehicle under impound number 4555. (*See id.*) A Hearing date for the citation was set for June 7, 2023. A hearing date for the impound, pursuant to NRS 706.476, was set for May 18, 2023.

May 18, 2023 – The hearing for the Emergency Suspension began, with Commissioner Groover presiding over the hearing.  Counsel for Salt Lake Express, Ford, (having been advised of this issue on May 16th) was not permitted to represent Salt Lake Express pursuant to NAC 706.3941(2), which requires attorneys to be able to practice before the Nevada Supreme Court. It was discovered that Ford is not licensed in Nevada, though he intended to practice in Nevada anyways. (Much like his client). Salt Lake Express requested the hearing date be continued for 60 to 120 days. No hearing date was set, as Erickson expressed the requirement that the hearing take place within the required 45 days.

May 18, 2023 – Immediately after the Emergency Suspension hearing, the hearing on the impound was heard. This hearing was presided over by Commissioner Gibbons. Ford was permitted to appear on behalf of Salt Lake Express pursuant to NAC 706.3941(1), which allows anyone to appear on behalf of a party at the discretion of the

hearing officer. Ford elected to also hold the hearing for citation 24785 in addition to the impound hearing. Ultimately, the underlying violation for the citation and impound were both found to have occurred. The impound was upheld. A fine of $5000 was issued for the citation, though Salt Lake Express was informed that fine would not be due until after review of the finding by the full authority, which would not occur for approximately one month. A fine in the amount of $5000 was also issued for the impound. Pursuant to NRS 706.476, that fine must be paid prior to the release of the impounded vehicle.

## III.   LEGAL AUTHORITY

A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as a matter of right. *Munaf v. Green*, 553 U.S. 674, 689–690 (2008) (internal citations omitted). It is intended to protect against the irreparable loss of rights prior to judgment on the merits of a claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Preliminary injunctive relief may be awarded only on a clear showing that the Plaintiff is entitled to relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

Preliminary injunctions come in two varieties: (1) a prohibitory injunction, which commands a party not to do an act and preserves the status quo, and (2) a mandatory injunction, which commands a party to take affirmative action irrespective of the status quo. *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir. 1994).

Here, Plaintiff seeks both a mandatory and a prohibitory injunction, as it appears it wants the Court to command Defendant to release the impounded vehicle at no cost to Salt Lake Express. And as the prohibitory injunction, to prohibit Defendant from interfering with Salt Lake Express' operations on any regularly scheduled route with stops outside of Nevada, and from not retaliating against Salt Lake Express in any manner. ECF No. 6 at 23.

A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) that an injunction is in the

public interest. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008)(citations omitted); *Am. Trucking Ass'ns, Inc. v. City of L.A.,* 559 F.3d 1046, 1052 (9th Cir. 2009); *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011). In every case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24 (citation omitted).

When a party seeks mandatory preliminary injunctive relief, as opposed to prohibitory preliminary relief, courts must be extremely cautious about issuing a preliminary injunction. *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984) (citing *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). Mandatory preliminary injunctive relief should be issued only when the facts and law clearly favor the moving party. *Anderson*, 612 F.2d at 1114. It requires proof of the same elements as a prohibitory injunction, plus the "additional factor" of overcoming the court's "extreme[ ] cautio[n]." *Marcik*, 740 F.2d at 675. Mandatory injunctions are "particularly disfavored and should not be issued unless the facts and law clearly favor the moving party." *Anderson*, 612 F.2d at 1114–1115.

## IV.    ANALYSIS

### Plaintiff Fails the Four-Prong Test

Plaintiff's motion for a preliminary injunction falls far short of the necessary showing he must demonstrate before a preliminary injunction should be issued; therefore, this Court should deny Plaintiff's Motion ECF No. 6.

### 1.    Plaintiff Cannot Establish a Strong Likelihood of Success on the Merits

Plaintiff is not likely to succeed on the merits in this matter for a myriad of reasons. Specifically:

a. <u>There Has Not Even Been Proper Service</u>

Rule 12(b)(5) authorizes dismissal due to insufficient service of process. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (stating that

[i] the absence of service of process . . . a court ordinarily may not exercise power over a party the complaint names as defendant.") (internal citations omitted). "Before a . . . court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Strong v. Countrywide Home Loans, Inc.*, 700 Fed. App'x 664, 667 (9th Cir. 2017) (*citing Omni Capital Intil, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).

Here, the Complaint in this matter has not been served. Though Plaintiff's Counsel did share the relevant documents and the Order from the Court so that undersigned counsel may respond herein, Defendant's in this matter have not been properly served, which may become grounds for dismissal. As such, Plaintiff will not succeed on the merits.

b. <u>The Matter is not Ripe as Plaintiff did not exhaust Administrative Remedies</u>

The first requirement for declaratory relief is that the claim be ripe for review. *See Am. States Ins. Co. v. Kearns*, 15 11.3d 142, 143 (9th Cir.1994). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

If a court finds a claim for declaratory relief is ripe, it "must also be satisfied that entertaining the action is appropriate." *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir.1998) (emphasis added). This determination is discretionary, but a court's discretion is not unfettered. *Id*. "Essentially, the district court must balance concerns of judicial administration, comity, and fairness to the litigants." *Kearns*, 15 F.3d at 144 (quotations omitted); see also *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir.2004). "[Finally], and most importantly, before availing oneself of district court relief from an agency decision, one must first exhaust available administrative remedies." *Malecon Tobacco, LLC v. State ex rel. Dep it of Taxation*, 59 P.3d 474, 475-76 (Nev. 2002). Such exhaustion is not required only when administrative proceedings are "vain and

futile" or when the "agency clearly lacks jurisdiction." *Engelmann v. Westergard*, 647 P.2d 385, 389 (Nev.1982); see also *City of Henderson v. Kilgore*, 131 P.3d 11, 14-15 & n. 10 (Nev. 2006).

Here, Plaintiff has failed to exhaust its administrative remedies. The impoundment of Plaintiff's vehicle and the associated citation both were issued due to the Plaintiff operating without the proper license, a license which was temporarily suspended just a few days prior. However, the suspension, the citation, and the impound each have additional options for redress still within the administrative process.

As to the suspension, this is only a temporary suspension, subject to a hearing on the matter, which is required to occur within 45 days. The hearing was actually set within 8 days, and when it was found it needed to be continued, it was Plaintiff that requested it be set out for up to 120 days. Plaintiff has not even had the hearing which that decides the issue of its suspension. Though there were safety issues at the heart of the citations that led to the emergency suspension, and those needed to be acted upon, the emergency suspension was nonetheless not issued because of the merits of the underlying citations, but because Plaintiff failed to appear – twice – for the hearing on those citations. As such, the emergency suspension was issued, and the hearing was set. Who is to say how that hearing will go? It is not a forgone conclusion that the suspension will continue once Plaintiff is able to state their position to the Hearing officer. Plaintiff did not complete, or really even begin, the administrative process, and is instead the one pushing it out further than necessary.

As to the citation and impound, they were only done because Plaintiff was still operating, now without their license. The citation and the impound both went to a hearing before a hearing officer, but both of those decisions are not final until the hearing officer presents the proposed decision to the full Authority and they decide on the matter. Plaintiff still has the option of being heard in front of the full Authority on this matter. There has not been a final decision on the matter of the citation and impound.

. . .

Additionally, even the decision of the full Authority on all of these issues can be reconsidered by the Authority by way of a petition from the Plaintiff. Failing that, the issues can also be submitted to State Court, which is required, at least according to State law. NRS 233B.130(6) states "The provisions of this chapter are the exclusive means of judicial review of, or judicial action concerning, a final decision in a contested case involving an agency to which this chapter applies."

For all of the issues that led to this Motion for TRO/PI, there are still numerous administrative remedies that have not been exhausted. As such, this case is not ripe for review, and should be dismissed and Plaintiff is not likely to succeed on the merits.

### c. Federal Statutory Preemption Does not Apply Here

As outlined below, in some instances, the Federal government exercises jurisdiction over passenger ground transportation through the United States Department of Transportation ("DOT").   In such instances, federal law may preempt state law. *See infra*.   However, as discussed below, that is not the case here, as state law entirely controls.

Indeed, the most directly relevant federal statute (49 U.S.C. § 14501), which sets forth the specific circumstances under which a state's authority to regulate is preempted, provides as follows:

> (d) Pre-Arranged Ground Transportation.
> (1) In General. **No State or political subdivision thereof** and no intrastate agency or other political agency of 2 or more States **shall enact or enforce any law**, rule, regulation, standard, or other provision having the force and effect of law **requiring a license or fee** on account of the fact that a motor vehicle is providing pre-arranged *ground transportation service* **if the motor carrier providing such service**-
>
> (A)   *Meets all applicable registration requirements under chapter 139* for the interstate transportation of passengers;
>
> (B)   *Meets all applicable vehicle and intrastate passenger licensing requirements of the State or States in which the motor carrier is domiciled or registered* to do business; *and*

**(C)** **is providing such service pursuant to a contract for-**

    (i)     **transportation by the motor carrier from one State, including intermediate stops, to a destination in another State; or**

    (ii)    **transportation by the motor carrier from one State, including intermediate stops in another State, to a destination in the original State.**

(2) Intermediate stop defined.
**In this section, the term "intermediate stop,"** with respect to transportation by a motor carrier, *means a pause in the transportation* in order for one or more passengers to engage in personal or business activity, *<u>but only if</u> the driver providing the transportation to such passenger or passengers does not, before resuming the transportation of such passengers (or at least 1 of such passengers), provide transportation to any other person not included among the passengers being transported when the pause began.*

49 U.S.C. § 14501(d)(1) through (2) (1995) (emphasis added).

Statuses cannot regulate *interstate* prearranged, contracted for *ground transportation* –i.e., cases where the ground transportation *includes a stop outside their own specific jurisdiction, including "intermediate stops." See* 49 U.S.C. § 14501(d)(1).

However, State law preemption does not apply if the interstate ground transportation route includes a pause, where the driver then provides transportation in his or her vehicle to any new person not included among the passengers being initially transported along the interstate ground transportation route. *See* 49 U.S.C. § 14501(d)(2). Any stop along the route where a new passenger gets on would fall under this definition and would prevent preemption of State regulation.

The case closest on point here is one first raised by Plaintiff, that being *Sierra Nev. Transp., Inc. v. Nev. Transp. Auth.*, No. 3:21-cv-00358-LRH-CLB, 2022 U.S. Dist. LEXIS 89309 (D. Nev. May 18, 2022). In that case, The Plaintiff also asserted their transportation was entirely interstate. This Court found otherwise finding that "this Court finds that some aspects of SNT services constitute interstate travel, and some

aspects of its services are intrastate travel." *Id* at p. 9 ln 15-17. The Court found transportation of flight crews to be interstate transportation, however

> Still, trips for out-of-state business and vacation travelers booked by travel agents and other third-party companies, and ***trips prearranged and paid for in advance directly by the passengers constitute intrastate travel properly regulated by the NTA.*** The Court reaches this conclusion because neither of these services involve a contract with an interstate transportation provider to accommodate its employees. See Pennsylvania Public Utility Com., 812 F.2d 8 (D.C. Cir. 1987) (airlines); Brown's Crew Car of Wyoming LLC, 2009 U.S. Dist. LEXIS 39469 (D. Nev. 2009) (railroad companies). Rather, ***SNT contracts with these individual travelers to pick them up in Nevada and drop them off in Nevada. And while these transactions may occur across state lines, the purely local use of the actual transportation does not constitute interstate commerce***. See Mateo, 240 F.3d at 833 (stating that the determination whether plaintiff engaged in commerce "***must be guided by practical considerations, not technical conceptions.***"). Consequently, the Court finds that SNT's transportation services for individuals that are not airlines crews are wholly intrastate and the Court will dismiss this action.

*Id*. at p. 9 ln 27 – p. 10 ln. 11. (emphasis added).

Here, Salt Lake Express provides prearranged travel, paid for in advance by the passengers, to be picked up in Nevada, and dropped off in Nevada. The local use of the actual transportation does not constitute interstate transportation.

   d. <u>Even If The Route Plaintiff Describes Is Found To Be Interstate, The Impounded Vehicle In Question Was Still Only Conducting Intrastate Transportation</u>

The vehicle that was impounded, the citation that was issued, and the license that was suspended all relate to a certain route of transportation. Up until May 10, 2023, that route went from Reno, Nevada to Las Vegas, Nevada, stopping at various Nevada cities in between. Plaintiff had applied for a license to operate that route, was granted that license, and in so doing, agreed to abide by the regulations of the NTA. After certain safety violations were found to have occurred, a hearing was set for the citations related to those violations. Plaintiff then failed to attend that hearing and as such, that license

was suspended. The very next day, May 11, 2023, Plaintiff carried on providing transportation on that route, however, instead of either fixing any safety concerns that the NTA had, or even appearing for a hearing on that matter, Plaintiff instead decided to try to alter the scheduled route and attempt to extricate themselves from the authority of the NTA. Plaintiff added two additional stops to the route, one supposedly in Truckee, California, and the other in Death Valley, California.

NTA investigators, suspicious as they were still seeing Plaintiff's vehicles in the area knowing their license was suspended, went to investigate. On May 15, 2023, and May 17, 2023, the investigators made contact with the Plaintiff's vehicle and spoke to the Driver and the passengers. All of the passengers that the investigators spoke to on both days were traveling from Reno to other Nevada locations. The driver of the vehicle explained that a license wasn't needed because she drove to California first. When asked where in California she goes, she said that she drives across the border to a campground to turn around and then returns to Nevada. This campground is actually the location listed on Salt Lake Express' website as their Truckee California stop. (See Salt Lake Express website, submitted here as Exhibit 5). This site is not in Truckee proper, or near any other transportation hub. (See Google map of the area, submitted as Exhibit 6). It is, as the driver suggests, a place close to the border that one can turn around in. Plaintiff admits itself that no passenger has yet to be picked up or dropped off at either of the two new California stops. *See* ECF No. 6 at 20. Additionally, the trip to the campground in California is made prior to returning to Reno to pick up the first Reno passengers.

So, the vehicle at issue starts the day parked in Nevada. The driver also woke up in Nevada. She then went to get the vehicle, drove it to a campground across the border in California to turn around and go back to Nevada. There, she picks up her first passengers, individuals that are traveling from one Nevada location to another Nevada location.

As there were no passengers as of yet scheduled to be picked up or dropped off in Death Valley, California, it is unclear as to whether or not the vehicle even drove there,

as that detour adds significant time to the drive between Beaty and Pahrump. Certainly, as far as the vehicle at issue is concerned, the one that was actually impounded, that vehicle did not go to Death Valley, as the vehicle was impounded shortly after 2:30 pm. The investigators asked the driver where she had come from and she stated that she had just returned from Tonopah, her normal route. So this vehicle only made it as far as Tonopah, apparently dropping the passengers off so they can transfer to another vehicle to take them the rest of the route to Las Vegas. In any event, every portion of passenger transportation that occurred, occurred in Nevada. The only detour was the morning passenger-less jaunt over the border to a California campground.

This is classic subterfuge. The Ninth Circuit, citing *United Airlines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), defined "subterfuge" as a "scheme, plan, stratagem, or artifice of evasion." *E.E.O.C. v. Orange County*, 837 F.2d 420, 422 (9th Cir. 1988). The Nevada Supreme Court characterized the attempt by an employer to classify a worker as an independent contractor instead of an employee as subterfuge, stating;

> Thus, we reaffirm that a worker is not necessarily an independent contractor solely because a contract says so. Instead, the court must determine employee status under the applicable legal test, based on all the relevant facts. ***Courts must not allow contractual recitations to be used as "subterfuges" to avoid mandatory legal obligations.***

*Myers v. Reno Cab Co., Inc.,* 492 P.3d 545, 550 (Nev. 2021)(emphasis added)

Subterfuge is exactly what is happening in this case. Plaintiff is not actually picking up any passengers in either Truckee or Death Valley. It is not even certain the vehicles are even actually going all the way to Truckee or Death Valley. But, the day immediately after having their State license suspended, they declare that they have added new stops to their route, which coincidentally exempt them from all state regulation.

. . .

. . .

The entire route of the subject vehicle, on the date of the impound, from the time it picked up its first passenger to the time the vehicle returned to its final stop in Reno, remained in the State of Nevada. The vehicle's transportation was completely intrastate and subject to the regulation of the NTA. Plaintiff is not likely to prevail on the merits on this matter and the Impound and related citation of that vehicle was completely proper. As such, the TRO/PI should be denied.

### 2. Plaintiff Cannot Demonstrate Irreparable Injury If Preliminary Injunctive Relief Is Not Granted

Plaintiff cannot show he will experience any irreparable harm if injunctive relief is not granted. "In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an irreparable injury." *Cole v. Oroville Union High School Dist.*, 228 F.3d 1092, 1100 (9th Cir. 2000). "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar way.'" *Mayfield v. U.S.*, 599 F.3d 964, 970 (9th Cir. 2010) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). There must also be a credible threat that the moving party will be subjected to a specific injury again. *Kolender v. Lawson*, 461 U.S. 352, 355 (1983); *Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003); *Sample v. Johnson*, 771 F.2d 1335, 1340 (9th Cir. 1985). For an order granting prospective injunctive relief, the moving party is required to "demonstrate a reasonable likelihood of future injury." *Bank of Lake Tahoe*, 318 F.3d at 918 (citing *Kruse v. Hawaii*, 68 F.3d 331, 335 (9th Cir. 1995)).

"Speculative injury does not constitute irreparable injury sufficient to warrant granting preliminary relief. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (internal citations omitted).

Plaintiff has not shown that it will suffer irreparable harm.

. . .

As to the return of the vehicle, there will be no irreparable harm without the Court ordering its release. The impound was proper and the fine of $5000 was completely appropriate. The Plaintiff can simply pay the fine, and the vehicle will be released to them. It is that simple. Plaintiff is not suffering as a result of the loss of the vehicle. Plaintiff has laid out in their moving papers that "The Salt Lake Express fleet is interchangeable and vehicles are swapped in and out according to demand for size, maintenance schedules, and unplanned repair work as needed." ECF No. 6 at 20. As far as the threat of additional impounds, the Plaintiff will only be harmed insomuch as they continue to violate the laws of Nevada.

### 3. Plaintiff Cannot Show a Balancing Of Hardships Favoring Relief

The third factor to consider is the balancing of equities and whether the balance tips in favor of granting injunctive relief.  Issuance of an injunction in this matter is not necessary because there is no evidence before the Court that Plaintiff will actually suffer any unjustified harm in the absence of the relief requested.

Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.

Here, there will be a hardship on Plaintiff, however that was brought on by themselves by not keeping their fleet up to minimum standards, not appearing for scheduled hearings, and continuing to provide intrastate transportation even after having their license suspended.

Therefore, the balance of equity does not tip in favor of granting injunctive relief.

### 4. Plaintiff Cannot Show That Granting the Injunction Favors The Public Interest

Denying Plaintiff's Motion for TRO/PI is in the public's best interest. Plaintiff raises the issue of specific passengers being unable to travel, however the reason Plaintiff's license was suspended in the first-place stems from certain safety violations

and that their vehicles having not met certain minimum requirements. Those passengers are not better off driving through the desert of Nevada in vehicles that are unsafe. Additionally, the public interest is served by allowing Nevada regulatory agencies to properly regulate. The NTA is charged with protecting the traveling public as they are transported through Nevada. The public is only harmed if the NTA is hampered in their ability to do just that.

## V.  CONCLUSION

Plaintiff has failed to complete the administrative process and has prematurely brough this present action. Plaintiff is wrong in their understanding of the law and the difference between interstate and intrastate transportation. Additionally, Plaintiff is attempting to avoid certain legal requirements through subterfuge. For these reasons, and the additional reasons stated above, Plaintiff's Motion for a TRO/PI should be denied. (ECF No. 6).

DATED this 29th day of May, 2023.

AARON D. FORD
Attorney General

By:    /s/  Matthew P. Feeley
LOUIS V. CSOKA (Bar No. 7667)
Senior Deputy Attorney General
MATTHEW FEELEY (Bar No. 13336)
Deputy Attorney General
*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

    I certify that I am an employee of the State of Nevada, Office of the Attorney

3

General, and that on May 29, 2023, I electronically filed the foregoing **OPPOSITION TO**

4

**PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING**

5

**ORDER / PRELIMINARY INJUNCTION (ECF No. 6)** via this Court's electronic filing

6

system.   Parties who are registered with this Court's electronic filing system will be

7

served electronically.

8

9

10

                    /s/ Danielle Wright

11

                    Danielle Wright, an employee of the
                    Office of the Nevada Attorney General

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28