UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WESTERN TRAILS CHARTERS & TOURS LLC, dba SALT LAKE EXPRESS, an Idaho Limited Liability Company,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>NEVADA TRANSPORTATION AUTHORITY, a Division of the Nevada Department of Business and Industry, VAUGHN HARTUNG in his official capacity as Chair of the Commissioners of the Nevada Transportation Authority, JOHN DOES 1-X<br><br>　　　　　Defendants. | Case No. 3:23-CV-00219-RCJ-CLB<br><br>**ORDER** |

　　　　Western Trails Charters & Tours LLC, ("Plaintiff") brings an Action against the Nevada Transportation Authority ("NTA"), the Chair of the Commissioners of the Nevada Transportation Authority, and other relevant individuals (collectively "Defendants"). Plaintiff asks this Court to implement a temporary restraining order and preliminary injunction against the Defendants. Plaintiff argues that Nevada regulations do not apply to its operations, so the Defendants do not have jurisdiction over Plaintiff's operations. As explained at the hearing on

this Motion, the Court disagrees with Plaintiff and denies the Motion for a temporary restraining order and preliminary injunction.

**FACTUAL BACKGROUND**

This Action arises from the continued reluctance to submit to state level regulations for transportation. The Salt Lake Express (the "Express") is a bus line in Washington, Arizona, Montana, California, Wyoming, Idaho, Utah, and Nevada. (ECF No. 6 at 3). Plaintiff owns and operates the Express. (ECF No. 6). The Express submits to federal regulation and inspection of its vehicles. (*Id*. at 3-4). The Express also received a license to perform intrastate charter services between stops in Nevada from the NTA on January 22, 2018. (ECF No. 18 at 8).

The Express runs a route that "pick[s] up and drop[s] off passengers on trips that take place entirely within Nevada (such as from Winnemucca to Reno or Mesquite to Las Vegas)." (ECF No. 6 at 7). The Express runs these routes with passengers from outside the state as well passengers from Nevada because the bus may start in one state but go through Nevada to finish in another state. (*Id*. at 3-5). The Express started these interstate routes over 25 years ago, but claims that Nevada never subjected them to state regulation. (*Id*. at 5).

In 2021, The NTA solicited bids for a Las Vegas route that the Express ultimately won, which allowed them to provide on a bus route from Las Vegas to Reno that the NTA subsidized. (ECF No. 6 at 8). The Express carried passengers daily from Las Vegas to Reno starting on March 15, 2021. (*Id*.) This new route started in either St. George, Utah or Reno and ends in the city that the bus did not originate from. (*Id*.) While the route may start or end in a different state, there are passengers that ride the Express from Las Vegas to Reno or vice versa. (*Id*.)

On March 15, 2021, the NTA issued Plaintiff a ticket for operating the Express without authority and without receiving a Nevada state inspection for the Express' vehicle. (ECF No. 6 at 8). The NTA informed Plaintiff that it intended to regulate the Express because it traveled between

Las Vegas and Reno, even though it originated or ended in another state. (*Id*. at 9). The NTA also informed Plaintiff that it would impound the Express' vehicles if they did not submit to Nevada state regulation. (*Id*.) Plaintiff did not take any action to rectify the situation because it believed that the state regulator did not have the authority to regulate the Express' operations. (*Id*.)

On March 16, 2021, the NTA issued Plaintiff a ticket for operating the Express without authority and without receiving a Nevada state inspection for the Express' vehicle. (ECF No. 6 at 9). Again, the NTA threatened to impound the vehicle because it believed that the Express operated within the NTA's jurisdiction. (*Id*.) Later that day, Plaintiff submitted an application to the NTA for a license to cover the Express' intrastate operations. (*Id*.) That application "was incomplete and/or inaccurate and wasn't completed and accepted by the NTA until March 10, 2022." (ECF No. 18 at 8).

On March 17, 2021, Plaintiff submitted a letter to the NTA requesting interim access to operate the Express on the Las Vegas to Reno route. (ECF No. 6 at 9). The NTA accepted this request and permitted "special services and airport transfers within the State of Nevada." (ECF No. 18 at 8).

On May 5, 2022, and June 10, 2022, the NTA issued Plaintiff three total citations for charging and collecting unsubstantiated fees (NAC 706.311), failing to identify equipment to be used in order for intrastate commerce (NAC 706.354), failing to include license number on advertisement (NAC 706.354), and failing to maintain proper records for vehicle maintenance files (NAC 706.203). (ECF No. 19 at 6). On the day of the hearing for these citations, Plaintiff's counsel emailed the NTA for a WebEx link. (ECF No. 18 at 9). However, the hearing was in-person and counsel failed to plan accordingly, so the NTA rescheduled the hearing. (*Id*.) The hearing officer dismissed some citations and affirmed most of the citations at the rescheduled hearing. (ECF No. 19 at 30).

On March 16, 2023, the NTA issued the Express' driver three citations for driving without an NTA issued driver permit, not passing the NTA mandated state drug test, operating a vehicle without display of the interim license, and driving a vehicle without state inspection. (ECF No. 6 at 10). The citations set a hearing date for April 26, 2023. (ECF No. 18 at 9). The NTA sent Plaintiff the citations by certified mail and a representative of Plaintiff signed for them. (*Id*.) Plaintiff did not appear for the hearing. (*Id*.) The NTA rescheduled the hearing for May 10, 2023, and sent Plaintiff notice of the rescheduling. (*Id*.) Again, Plaintiff did not show up for the hearing. (*Id*.) For that reason, the NTA suspended Plaintiff's interim license on May 10, 2023, and scheduled a hearing to discuss the suspension. (*Id*.)

On May 11, 2023, Plaintiff unveiled new plans to extend "the Reno route to the north to service Truckee California and adding a stop in Death Valley California" between the Nevada stops. (ECF No. 6 at 12). Plaintiff reached out to the NTA on the same day and informed the NTA of the routes and stated Plaintiff's position that the routes were not subject to the NTA's jurisdiction. (*Id*.) Additionally, Plaintiff stated that it "would like to withdraw its March 16, 2021, application for [an interim license] to cover the regularly scheduled service in both directions between Las Vegas and Reno." (*Id*. at 12-13).

On May 15, 2023, the NTA stopped the Express' vehicle at the Reno Airport because the NTA knew that it did not have a license. (ECF No. 18 at 9-10). The NTA investigators asked the driver where they were headed. (*Id*.) The driver stated that the Express started a route that "drives over the state line into California where [it] turns around in a campground and heads back into Nevada to begin picking up passengers in Reno." (*Id*.) The investigators did not cite or impound the vehicle. (*Id*.)

On May 16, 2023, the NTA informed Plaintiff's counsel that he could not appear before the NTA commissioners for the suspension hearing because he did not possess a license to practice

law in Nevada. (ECF No. 6 at 13). Counsel appeared before the NTA before, but never possessed a license to practice law in Nevada. (ECF No. 18 at 10). The NTA claims that it did not know that counsel did not have the proper licensure until the hearing on the suspension. (*Id.*)

On May 17, 2023, the NTA impounded Plaintiff's vehicle for picking up passengers at the Reno Airport and the Nugget Casino in Reno. (ECF No. 18 at 10). The NTA issued Plaintiff a citation for operating a bus service without the proper licensure. (*Id.*) The passengers on the bus were left on the side of the road because the NTA impounded the vehicle. (*Id.*)

On May 18, 2023, the NTA commenced the hearing and refused to allow Plaintiff's counsel to appear in front of the commissioners. (ECF No. 6 at 13-14). Commissioner Groover presided over the hearing and did not allow Plaintiff's counsel to speak. (*Id.*) The NTA allowed for a rescheduling on the suspension hearing, but the parties did not agree to a date because neither party could agree to a timeline. (*Id.*) Immediately after the suspension hearing, the NTA commenced the hearing on the impounded vehicle. (ECF No. 18 at 10-11). Commissioner Gibbons presided over this hearing. (*Id.*) Commissioner Gibbons allowed Plaintiff's counsel to speak, citing NAC 7-6.3941(1), which allows anyone to appear at the discretion of the hearing officer. (*Id.*) Commissioner Gibbons upheld the decision to impound the vehicle. (*Id.*)

On May 22, 2023, Plaintiff filed this Action to seek relief from the NTA's regulatory authority. (ECF No. 1). On May 24, 2023, Plaintiff filed a Motion for a Temporary Restraining Order and a Motion for a Preliminary Injunction. (ECF Nos. 6, 8). On May 30, 2023, this Court held a hearing on the motions. (ECF No. 20).

///

///

///

///

**LEGAL STANDARD**

A temporary restraining order should be limited to carrying out its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods v. Bd. of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 439 (1974). It "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Temporary restraining orders are durationally limited and automatically expire, as their purpose is to preserve the status quo until a hearing can be held for a preliminary injunction. Fed. R. Civ. P. 65(b)(2); *Winter*, 555 U.S. at 24. Such orders are non-appealable, *Mayweathers v. Gomez*, 60 F.3d 833 (9th Cir. 1995); *Forest v. F.D.I.C.*, 976 F.2d 736 n.1 (9th Cir. 1992), and are committed to the sound discretion of the trial court, *Jimenez v. Barber*, 252 F.2d 550, 554 (9th Cir. 1958). A temporary restraining order "may only be awarded upon a clear showing [by] the plaintiff [that it] is entitled to such relief." *Winter*, 555 U.S. at 22.

While temporary restraining orders differ in many important respects from preliminary injunctions, the standard for granting a temporary restraining order and a preliminary injunction is the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (stating that a separate analysis was not required because the analysis is "substantially identical" for a temporary restraining order and a preliminary injunction); *V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1123 (D. Nev. 2013). To obtain preliminary injunctive relief, the Ninth Circuit has established two alternative sets of criteria:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). The Supreme Court later ruled, however, that a plaintiff seeking a preliminary injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 555 U.S. 7, 19–23 (2008) (rejecting the alternative "sliding scale" test, at least as to the irreparable harm requirement). In *Stormans, Inc. v. Selecky*, the Ninth Circuit recognized that the "possibility of irreparable injury" test was "definitively refuted" in *Winter* and that the appropriate standard "requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20) (reversing a district court's use of the Court of Appeals' pre-*Winter*, "sliding-scale" standard and remanding for application of the proper standard).

However, the Ninth Circuit later held in *Alliance for the Wild Rockies v. Cottrell* that although irreparable harm must be more likely than not, the sliding scale approach remains viable as to the other requirements, and a plaintiff needn't be more likely than not to succeed on the merits, so long as there are "serious questions" on the merits. 632 F.3d 1127, 1134–35 (9th Cir. 2011) ("That is, 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, . . . [if] the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."). *Cottrell* presents some difficulty considering *Winter* and *Stormans*. To the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Stormans*, *Stormans* should control. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (discussing the standards for determining controlling authority).

The Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to suffer irreparable harm

in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20. As a matter of grammar, the Supreme Court has laid out four conjunctive tests, not a four-factor balancing test, using the word "likely" to modify the success-on-the-merits test in the same way as the irreparable-harm test. In finding the "possibility" of irreparable harm to be insufficient, the *Winter* Court itself emphasized (with italics) the fact that the word "*likely*" modifies the irreparable-harm prong. *Id.* at 22. The word "likely" modifies the success-on-the-merits prong in a textually identical way. *Id.* at 20. Therefore, to satisfy *Winter*, a movant must show that he is likely to succeed on the merits and suffer irreparable harm.

Regarding the irreparable-harm test, *Winter* is clear that the word "likely" means what it normally means, i.e., more probable than not. There is tension in the case law, however, as to the meaning of likely as applied to the success-on-the-merits test. Black's Law Dictionary defines the "likelihood-of-success-on-the-merits test" as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable probability of success . . ." *Black's Law Dictionary* 1069 (10th ed. 2014). A Ninth Circuit case predating *Cottrell* that used the "serious questions on the merits standard" as an alternative to a "probability of success on the merits" defined serious question as a "fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1985). The Ninth Circuit has reiterated the "fair chance" language since *Cottrell*. *See, e.g.*, *Arc of Cal. v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014).

///

///

///

///

///

**ANALYSIS**

As discussed at the hearing on these motions, the Court denies Plaintiff's Motions because the Express falls under the NTA's jurisdiction. (ECF Nos. 6, 8). Plaintiff cannot show that it is likely to succeed on the merits. The likelihood of Plaintiff facing harm without the preliminary relief is improbable if not non-existent. The balance of hardships tip in favor of the NTA because it should not be forced to stop regulating simply because Plaintiff does not want to follow state law. Finally, allowing the NTA to carry out its function as a regulator and forcing Plaintiff to submit to regulation like every other business advances the public interest because the public can trust that buses in Nevada comply with local regulations.

**A. Likelihood of Success on the Merits**

Plaintiff cannot show that it is likely to succeed on the merits. The crux of this Matter surrounds the NTA's ability to regulate the Plaintiff's operations. Plaintiff claims that it operates an interstate route with intrastate stops, so only federal regulation applies. The NTA contends that Plaintiff operates an intrastate route because Plaintiff picks up passengers in Nevada and drops them off in Nevada, regardless of whether Plaintiff's routes start and stop in another state. Essentially, the parties are arguing over whether the travel is intrastate or interstate.

The Commerce Clause is violated when a state action "unjustifiably…discriminate[s] or burden[s] the interstate flow of articles of commerce." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994)). States cannot regulate interstate prearranged, contracted for ground transportation –i.e., cases where the ground transportation includes a stop outside their own specific jurisdiction, including "intermediate stops." *See* 49 U.S.C. § 14501(d)(1). In the local transportation context, the "ultimate test" as to whether the interstate flow of articles of commerce is involved "is whether the local transportation service is an 'integral step in the interstate

movement.'" *Mateo v. Auto Rental Co.*, 240. F.2d 831, 833 (9th Cir. 1957) (quoting *United States v. Yellow Cab. Co.*, 332 U.S. 219, 229 (1947), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)).

Another division of this Court recently took up the issue of intrastate v. interstate travel. In *Sierra Nevada Transportation v. NTA*, a motor carrier sought refuge from NTA regulation by arguing that it provided interstate travel services. *Sierra Nevada Transportation v. NTA*, Case No. 3:21-cv-00358-LRH-CLB (D. Nev. 2022). The motor carrier conducted limousine services with a headquarters in New York. (*Id*. at 2). The motor carrier picked travelers up at the airport in Reno and drop them off in other destinations in Nevada. (*Id*.) Passengers booked the service with a booking agent located in New York. (*Id*.) The motor carrier argued that the passengers came in from another state's airport and finished their travels in Nevada, which made the travel interstate. (*Id*.) The Court concluded that the motor carrier fell under the NTA's jurisdiction because it "pick[ed] them up in Nevada and drop[ped] them off in Nevada." (*Id*. at 10). Accordingly, the NTA possessed the authority to regulate the motor carrier.

Plaintiff's operations fall under the NTA's jurisdiction because the Express is an intrastate operation that takes passengers from a Nevada city to another Nevada city. Plaintiff concedes that its busses pick passengers up in Nevada and drop those same passengers off in Nevada. (ECF No. 6 at 7) (Plaintiff "has informed the NTA multiple times that both the I-15 Route and the I-80 Route do pick up and drop off passengers on trips that take place entirely within Nevada (such as from Winnemucca to Reno or Mesquite to Las Vegas)"). Simply starting a route in one state does not change the fact that the local travel from one Nevada destination to another Nevada destination "is an integral step in the interstate movement." *Mateo*, 240. F.2d at 833. Therefore, Plaintiff conducts intrastate travel and the NTA has the authority to regulate Plaintiff's operations. For that reason, there is no likelihood that Plaintiff will succeed on the merits.

### B. Likelihood of Harm

The NTA's continued efforts to regulate Plaintiff does not create a likelihood harm. For this prong, Plaintiff needed to show it would likely face harm if the NTA continued to fine Plaintiff, impound Plaintiff's vehicles, and force Plaintiff to follow the law. Plaintiff argued that it faced harm when the NTA impounded its vehicle because it "was embarrassing and caused the company to commit the unpardonable sin for a public carrier – it left passengers stranded with no alternative way to help them." (ECF No. 6 at 21). The harm that Plaintiff faced was the result of Plaintiff's own inability to show up for hearings, follow local regulations, and ensure that it would not face embarrassment. Beyond that, the harm that Plaintiff faces in allowing the NTA to go forward with regulation is non-existent. The NTA simply wants Plaintiff to follow the law and nothing is stopping Plaintiff from working with the NTA to comply with the law. The harm that Plaintiff fears is nothing more than further accountability for Plaintiff's actions.

### C. Balance of Hardships

The balance of hardships falls in favor of the NTA. Plaintiff alleges that the Court should find in its favor on this prong because complying with local laws will result in lost revenue. On the other hand, the NTA loses the ability to ensure safe buses for the residents of Nevada that are looking to travel from Reno to Las Vegas, the two most populated cities in the state. Without a doubt, the balance of hardships tips in favor of the NTA.

### D. Public Interest

The NTA's interest in regulating transportation companies is in the public's best interest. Plaintiff argues that it cannot be in the public interest to deny residents efficient bus travel options across Nevada. (ECF No. 6 at 23). Plaintiff posits the question "what is missing your child's final high school baseball game worth?" (Id. at 21). Well, attending that game is likely worth the price

of a bus that the NTA inspected. The public interest weighs in favor of allowing the NTA to continue to regulate intrastate transportation routes, like the one that Plaintiff operates.

## CONCLUSION

Plaintiff states that the NTA declared war on Plaintiff when it impounded the Express' vehicle. In actuality, the NTA went about its business as a regulator. The NTA dealt with Plaintiff's inability to follow regulations for almost two years before acting. Plaintiff had every opportunity to comply. Instead, Plaintiff chose to bring an action in this Court to evade the obligation to comply. The Court recognizes Plaintiff's actions and denies the motions for a temporary restraining order and a preliminary injunction.

IT IS HEREBY ORDERED that Plaintiff's Motion for a Temporary Restraining Order and Plaintiff's Motion for a Preliminary Injunction are **DENIED**. (ECF Nos. 6, 8).

IT IS SO ORDERED.

Dated this 17th day of August 2023.

_____
ROBERT C. JONES
United States District Judge